[Crim. No. 355. Third Appellate District.—September 8, 1916.]

## THE PEOPLE, Respondent, v. HENRY CARDER, Appellant.

CRIMINAL LAW—PREJUDICIAL REMARKS OF COURT TO JURY.—It is reversible error in a criminal case, upon the jury returning into court and reporting their inability to agree, for the court to make such remarks as, "I don't want to decide any question of fact for you; *that question though it seems very plain to me"*; and, "You must try to reconcile the testimony if you can and come to a verdict, gentlemen, if you possibly can. These cases are expensive to try"; and *"How many contrary ones are there?"* and "Questions of fact you must decide; *there oughtn't to be any trouble. It's a case you ought to decide, ought to agree upon and don't make up your minds that you can't agree, don't get contrary but just in a good humor, good-natured way work it out."*

APPEAL from a judgment of the Superior Court of Mendocino County, and from an order denying a new trial. J. Q. White, Judge.

The facts are stated in the opinion of the court.

Charles Kasch, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

BURNETT, J.—Defendant was convicted of the larceny of a calf, and he appeals from the judgment and order denying his motion for a new trial.

Among the alleged errors, the most serious is involved in certain remarks to the jury made by the trial judge. It seems that after the case was submitted the jury returned into court at 3:35 P. M. on Friday, and asked to have certain

evidence read to them. This was done and they again re-
tired. A few hours later they returned to the courtroom and
the foreman informed the presiding judge that in his opin-
ion the jury could not agree. The trial judge then said:
"You must work this out, gentlemen, if there is anything I
can help you in I can do it, and I will be here ten minutes
longer to help you. You oughtn't to make up your mind
you are not going to agree on this kind of a case, simply calls
for the sensible reasoning of men according to the evidence
and talk it over together." Furthermore, in reply to a
juror's question, the court said: "I don't want to decide any
question of fact for you; *that question though it seems very
plain to me.*" A little later he used this language: "You
must try and reconcile the testimony if you can and come to
a verdict, gentlemen, if you possibly can. These cases are
expensive to try."

The jury returned again into court on Saturday morning
at 10:35, and the transcript reveals the following: "Clerk:
Have you reached a verdict, gentlemen? A. We have not.
Court: Well, what can I do for you, gentlemen? Juryman
Yates: Your Honor, please, there isn't a possibility I don't
think in the minds of any of the jury that we can agree. We
have went over the evidence and every particle of that; we
can agree as to what the evidence is but we can't agree on a
verdict. The Court: You can't agree, you think? Juryman:
No, sir, done everything that we could to reach a verdict since
you left here last night. The Court: *How many contrary ones
are there?* Juryman: Two. Court: Well, I tell you, gentle-
men, you can work just as good on this, a jury can on holi-
days, Sundays and any other time and the law is all right in
that respect and the court can take the verdict at any time,
too, on Sunday as well as Saturday afternoon; now, if there
is any question of law that you need that you are in doubt
about, why I will give it to you. Questions of fact you must
decide; *there oughtn't to be any trouble. It's a case you
ought to decide, ought to agree upon and don't make up your
minds that you can't agree, don't get contrary but just in a
good humor, good-natured way work it out.* Juryman Cle-
land: Your Honor, we worked all night in there and we have
talked all night. I think we have got it down to where they
say we have made up our minds and no use to argue.
Court: Well, of course men go into the jury-room. They

think their minds are made up and some little question comes up, they come to the conclusion then they ought to change it. If they keep working on the theory they are not going to change their minds, it is made up, of course they will not, but that's not the way for a jury to do, want to work at it with the possibility always in view that I may be wrong about this and I'll change if I am. . . . You think there is no question of fact the court can help you on by having it read? A. I don't think so. Court: Well, go back and go to work, gentlemen. The court will be here any time when you agree.''

The jury returned later to have some of the testimony read. They retired again for deliberation and finally brought in a verdict of guilty.

We think it quite apparent that from the statements of the learned trial judge the jury must have concluded that he was convinced of the defendant's guilt and that as honest men it was their duty to so find. A portion of the remarks we have quoted was quite appropriate and calls for no criticism, but the statements we have italicized constitute, in our opinion, an infringement of the special prerogative of the jury. It was proper for the presiding judge to admonish the jury of their duty to consult together, to listen to argument, and to endeavor earnestly to reach an agreement, and, although of somewhat questionable propriety to remind the jury of the expense of a new trial, such remark could not justly be held sufficient ground for reversal, nor perhaps even for criticism; but to characterize the two dissentient jurors as *contrary,* and to declare that there should be no trouble about agreeing upon a case like this, and that it simply called for the sensible reasoning of men according to the evidence, transcends the proper limits of judicial discretion and authority. The *contrary* jurors were undoubtedly for acquittal. It is not likely that if the other ten had been opposed to conviction they would so readily have yielded to the persuasive suggestions of the trial court. Of course, these two jurors had the same legal and moral right to their opinion of the guilt of the defendant as had the other ten, and their attitude should not have been ascribed to obstinacy. That under our system, in the determination of the guilt or innocence of a defendant, the jury must be left free from coercion or influence of the trial judge, will not be gainsaid. This right and privilege accorded by the constitution to one charged with

crime is manifestly fundamental and vital. If serious infractions of it are to be tolerated, then trial by jury becomes a delusive formality.

The case here is controlled by the principle of the decision in *People* v. *Kindleberger,* 100 Cal. 367, [34 Pac. 852], and *People* v. *Conboy,* 15 Cal. App. 97, [113 Pac. 703]. In the former, the trial judge said to the jury: "In view of the testimony in this case the court is utterly at a loss to know why twelve honest men cannot agree." And in the latter, the objectionable remark was: "Now, gentlemen, I think I have read to you about all the instructions you desire upon these points and I suggest to you that *there is no reason why twelve honest, intelligent, reasonable men should not reach a conclusion in this case and I am surprised that you have not done so already.*"

The case at bar for the same reason is equally subject to animadversion and the only reasonable conclusion, as we conceive it, is that the jury were prejudicially influenced against the defendant. It may be said as to this, that the principle is thoroughly considered and the cases reviewed by Mr. Justice Kerrigan in the Conboy decision, *supra,* and therefore we need pursue the subject no further.

The other questions discussed will probably not arise again and we forego specific consideration thereof, but for the reason stated, we think the defendant did not have a fair trial, and the judgment and order are reversed.

Chipman, P. J., and Hart, J., concurred.